**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KELLIE R. OLSON,** | : | **Civil No. 1:21-cv-1527** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.   Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Kellie Olson filed an application for disability and disability insurance benefits under Title II of the Social Security Act on December 31, 2018. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Olson was not disabled and denied her application for benefits. Olson now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.    **Statement of Facts and of the Case**

On December 31, 2018, Olson applied for disability benefits, alleging an onset of disability on August 1, 2016. (Tr. 86). She alleged disability due to Ehlers-Danlos Syndrome ("EDS"), spinal fluid, anxiety, and asthma. (Id.) She was 39 years old on the date of her alleged onset of disability, she had some college education, and she had past work experience as a family caseworker, a front desk supervisor, and a hotel clerk. (Tr. 23, 48).

With respect to the relevant time period, Olson presented to physical therapy in June 2016 with knee pain. (Tr. 340). She was scheduled to receive physical therapy for six weeks. (Id.) By mid-June, Olson reported feeling better, and that she had been active over the weekend. (Tr. 345). Olson was discharged on July 5, 2016, and treatment notes indicate that she sprained her left ankle, but she asked for it to be taped because she had a busy day and was going to be on her feet the next day. (Tr. 363). She reported 0/10 pain in her knee. (Id.)

At a visit to Hamlin Family Health Center in March of 2017, Olson reported dull body aches with her pain being rated a 5/10. (Tr. 562). On physical examination, there was no cyanosis, edema, or clubbing. (Tr. 564). She was also assessed as having a normal affect. (Id.) In May of 2017, Olson was treated for an upper respiratory infection, and it was noted she had a history of asthma. (Tr. 567). A chest x-ray was performed, and Olson was diagnosed with asthmatic bronchitis. (Tr. 568). At this time, Olson denied headaches, anxiety, and depression, and a physical examination revealed no cyanosis or edema. (Tr. 570, 572).

In June of 2017, Olson was receiving physical therapy for her feet. (Tr. 386). She reported that she saw a podiatrist who told her she needed surgery, but she got a second opinion from Scranton Orthopedics who recommended physical therapy. (Id.) Olson stated that she was having difficulty completing activities of daily living

and found it difficult to tolerate walking. (Tr. 389). On June 22, 2017, Olson reported that her ankle was sore but not painful. (Tr. 395).

In July 2017, Olson continued to treat her foot and ankle pain with physical therapy at the recommendation of Dr. Siebecker of Scranton Orthopedics. (Tr. 420). On July 7, she reported her foot being sore because she had been on her feet all day. (Tr. 422). A few days later, Olson told her physical therapist that she had been gardening for several hours and felt like she overdid it. (Tr. 424). On July 19, Olson reported that her right foot felt better and that her left foot felt weak, but she had no pain in that foot or ankle. (Tr. 428). When she left therapy, her pain was rated as a 2/10, and she related to the therapist that she wanted to improve her cardio fitness. (Id.) On July 21, she reported some weakness after she had been gardening. (Tr. 430). A treatment note from July 26 indicated that Olson believed therapy was helping and she wanted to continue to improve her strength and range of motion. (Tr. 443). An evaluation of Olson revealed that her left foot was not as sore due to wearing her Arizona brace, but that she was still having some level of difficulty with activities of daily living. (Id.)

Olson presented to Debra Bertsche, PA-C, in August 2017 complaining of bilateral foot pain. (Tr. 574). It was noted that Olson was using an Arizona splint and was participating in physical therapy. (Id.) Olson stated she was frustrated due to her inability to do what she used to do but did not have anxiety. (Id.) However, it

4

was noted that Olson was taking medication for anxiety. (Tr. 576). On examination, Olson had an antalgic gait but normal alignment of leg, ankle, hindfoot, and foot. (Tr. 577). She was advised to follow up in six months. (Tr. 576).

Olson continued physical therapy in August of 2017. On August 4, she reported some swelling after being on her feet all day doing things for her family. (Tr. 457). She rated her pain a 2/10. (Id.) At a later appointment, Olson stated that her foot brace on her left foot controlled her pain. (Tr. 459). On August 14, Olson reported that she felt her left foot was getting stronger and her right foot was not getting worse because of therapy. (Tr. 463). She rated her pain a 2/10 after her session. (Id.) About a week later, Olson reported increased swelling and pain after moving her daughter into college, which required a lot of standing and walking. (Tr. 467). At a follow up session on August 23, Olson stated that she had been on her feet for days straight, moving her daughter into college, having lunch with friends, and cleaning her home. (Tr. 471). An evaluation from this date indicated that Olson "has made significant improvements" and "has made great gains in her strength and range of motion of B ankles at this time and is feeling that she is able to complete more activity prior to increased pain." (Tr. 478, 480).

In September of 2017, Olson stated that the Arizona brace helped her left foot, and she was looking into getting a brace for her right foot. (Tr. 492). On September 20, Olson stated that she was feeling good, that she felt like her pain had greatly

decreased since starting therapy, and she was getting an Arizona brace for her right foot. (Tr. 498). It was noted at this visit that Olson "now experiences no pain at rest and minimal pain with prolonged activity," and that she was "able to complete[] tasks and chores at home with little to no difficulty." (Id.) Olson was discharged from physical therapy at that time. (Id.) Olson presented to Dr. Siebecker at Scranton Orthopedics in September 2017, who indicated that the braces were helping her manage, and that he was not recommending surgery at that time, as the "surgery is really reserved for patients who have difficulty with ambulation." (Tr. 327).

Olson presented to Jennifer Weidner-Clark, PA-C, on March 20, 2018. (Tr. 578). She stated that her "feet collapsed upon themselves." (Id.) She reported that she was supposed to wear the Arizona braces on her feet but did not wear them. (Id.) On examination, she had no cyanosis or edema, but her foot arthropathy was noted as deteriorated. (Tr. 579-80). In July 2018, after the relevant time period, Olson saw Weidner-Clark complaining of pain in her right elbow, and it was noted that Olson hurt it chucking wood off of her porch. (Tr. 581). The pain was worse with chopping, vacuuming, and shifting the car. (Id.) It was also noted that Olson had joint pain which had started 4 to 8 weeks prior. (Id.) Her elbow pain was assessed as new, and Weidner-Clark ordered an x-ray. (Tr. 583). The plaintiff began physical therapy for her elbow pain in September of 2018. (Tr. 721).

At a visit to Dr. Gary Bellus, M.D., in August 2018, Olson was assessed in the genetics clinic for joint pain, and Dr. Bellus noted her symptoms were consistent with Ehlers-Danlos Syndrome ("EDS"). (Tr. 606). Dr. Bellus' treatment notes indicate that Olson's joint pain was made worse by her obesity, and he recommended she lose weight. (Id.) On physical examination, it was noted that Olson had increased range of motion in her fingers; increased knee range of motion; and normal muscle mass in her bilateral upper and lower extremities. (Id.) Dr. Bellus recommended physical therapy and weight loss and wanted Olson to follow up in two years. (Tr. 607-08).

The record included additional medical evidence following Olson's date last insured. Thus, Olson saw Weidner-Clark on October 15, 2018, for complaints of anxiety. (Tr. 870). Weidner-Clark noted that medication had been effective in the past. (Id.) Olson reported excessive worry, restlessness, and difficulty concentrating. (Id.) In February of 2019, Olson complained of right ankle and joint pain, and she asked for a prescription brace which was recommended by a foot doctor. (Tr. 879).

Olson presented to Weidner-Clark in July of 2019 with complaints of anxiety and musculoskeletal pain. (Tr. 1043). Olson stated that her pain somewhat impaired her daily activities, and Weidner-Clark noted that Olson had an interest in seeing Dr. Scott Epstein, M.D., whom her husband saw. (Id.) A physical examination revealed no cyanosis or edema, decreased range of motion with braces, tenderness of her

paralumbar muscles, but a negative straight leg raise test. (Tr. 1046). Olson was advised to continue treating with multiple specialists and to lose weight, and Weidner-Clark referred her to Dr. Epstein for pain management. (Id.)

Olson treated with Dr. Scott Epstein, M.D., in 2019 for back and neck pain. (Tr. 1009). It was noted that Olson had spinal stenosis of the lumbar and cervical regions, which had an onset date of August 15, 2019. (Tr. 1010). Dr. Epstein noted a history of migraines that was well controlled with supplements, and her history of ankle problems. (Id.) It was further noted that Olson had an MRI in July of 2019, which revealed central canal stenosis, bilateral neuroforminal narrowing, bilateral facet joint hypertrophy with edema, for which lumbar injections were recommended. (Tr. 1011). On examination, Olson had a negative straight leg raise bilaterally, normal strength in her knees and shoulders, and full range of motion in her neck. (Id.) In October of 2019, Olson asked Dr. Epstein about the possibility of using medical cannabis to control her pain. (Tr. 1018). At a follow up appointment in January of 2020, Dr. Epstein noted that the medical cannabis was helping Olson's pain. (Tr. 1023). Olson continued to report chronic pain in May of 2020. (Tr. 1027).

Olson also treated with Weidner-Clark in February of 2020 complaining of fibromyalgia symptoms. (Tr. 1049). It was noted that she had been using medical marijuana at the direction of pain management. (Id.) A physical examination revealed multiple pin point tender areas on her beck, back, arms, and legs consistent

with fibromyalgia. (Tr. 1052). In June of 2020, Olson started medication for her fibromyalgia symptoms. (Tr. 1058).

Weidner-Clark filled out a medical source statement for Olson on June 26, 2020. (Tr. 1167-84). On this score, Weidner-Clark stated that Olson could occasionally lift/carry up to 10 pounds due to her elbow pain; could sit, stand, and walk for a total of 2 hours in an 8-hour work day, could stand and walk for 15 minutes at a time, and could sit 30 to 45 minutes at a time due to her chronic knee and back pain; could occasionally reach, handle, finger, push and pull with both hands, but could never feel due to her polyneuropathy; could occasionally operate foot controls due to her polyneuropathy; and could occasionally climb stairs and ramps, but could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (Tr. 1167-70). Weidner-Clark further opined that Olson could never be exposed to environmental conditions, except she could occasionally operate a motor vehicle. (Tr. 1171). She stated that Olson could not travel without a companion, walk a block at a reasonable pace, or climb a few steps at a reasonable pace, but she could shop, ambulate without an assistive device, use public transportation, prepare simple meals, care for her person hygiene, and sort, handle, or use paper/files. (Tr. 1172). Notably, Weidner-Clark opined that the limitations lasted or were expected to last 12 months, but did not opine to a reasonable degree of medical probability on what date the limitations were first present. (Id.)

On July 27, 2020, Dr. Epstein opined in a letter to the plaintiff's counsel that Olson could perform, at most, sedentary level work on a full-time basis. (Tr. 1060). Dr. Epstein stated that Olson suffered from L4-5 spinal stenosis, C4-6 spinal stenosis, fibromyalgia, polyneuropathy, pes planus in both feet, and EDS. (Id.) He opined that Olson had an antalgic gait, was unable to stand on her toes, and could stand on her heels. (Id.) Dr. Epstein stated that Olson could occasionally handle 10 pounds, but no frequent lifting or carrying; should rarely bend and squat; could reach occasionally; and should not use her feet repetitively. (Id.) Ultimately Dr. Epstein recommended a primarily seated job. (Id.)

It is against this medical backdrop that the ALJ conducted a hearing in Olson's case on October 22, 2020. (Tr. 36-84). At the hearing, Olson and a Vocational Expert testified. (Id.) Following the hearing, on November 13, 2020, the ALJ issued a decision denying Olson's application for benefits. (Tr. 7-30).

In that decision, the ALJ first concluded that Olson had not engaged in substantial gainful activity between August 1, 2016, her alleged onset date, and June 30, 2018, her date last insured. (Tr. 12). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found Olson had the following severe impairments: Ehlers-Danlos Syndrome ("EDS"); bilateral pes planus with posterior tibial tendinitis; degenerative disc disease of the lumbar spine; left knee patellofemoral syndrome; asthma; and obesity. (Id.) The ALJ found Olson's anxiety

and optic neuritis nonsevere, and further found that her right elbow epicondylitis did
not meet the durational requirement and her fibromyalgia was not diagnosed until
after the date last insured. (Tr. 12-15). At Step 3, the ALJ determined that Olson did
not have an impairment or combination of impairments that met or medically
equaled the severity of one of the listed impairments. (Tr. 15-16).

Between Steps 3 and 4, the ALJ concluded that Olson

[H]ad the residual functional capacity to perform light work as defined
in 20 CFR 404.1567(b) with the following limitations. The claimant
was limited to occasional pushing and pulling with the lower
extremities, such as in the operation of foot pedals and foot controls.
Further, the claimant was limited to occasional balancing, stooping,
kneeling, crouching, use of ramps and climbing of stairs, but may never
crawl or climb ladders, ropes, or scaffolds. Additionally, the claimant
was limited to occasional exposure to vibrations, and must avoid
potential pulmonary and respiratory irritants, such as strong fumes,
noxious odors, concentrated dusts or gases, and work environments
with poor ventilation. Finally, she must avoid hazards, such as
unprotected heights and dangerous moving machinery.

(Tr. 16-17).

In reaching this RFC determination, the ALJ considered the medical evidence
set forth above, the medical opinion evidence, and Olson's statements regarding her
limitations. With respect to the medical opinion evidence regarding the alleged
physical impairments, the ALJ considered the opinions of Dr. Epstein and PA-C
Weidner-Clark. (Tr. 21-23). The ALJ found that Dr. Epstein's July 2020 opinion
was not persuasive. (Tr. 21). At the outset, the ALJ noted that Dr. Epstein's opinion
was rendered almost two years after the date last insured, and that this opinion was

not entirely consistent with or supported by the plaintiff's treatment notes during the relevant period. (Tr. 21-22). On this score, the ALJ recognized that Olson had feet and ankle x-rays during the relevant time, stenosis that was present, and a later diagnosis of EDS that supported limiting her to light, rather than sedentary work. (Tr. 22). The ALJ reasoned that there were abnormalities noted with respect to Olson's feet and ankles, but they were at times inconsistent. (Id.) Further, the record indicated that at times, Olson had an antalgic gait, but at other times she did not, and there was no medical source that prescribed her an assistive device. (Id.) Thus, the ALJ found this opinion unpersuasive.

The ALJ also considered PA Weidner-Clark's June 2020 opinion and similarly found that this opinion was unpersuasive. (Tr. 22-23). First, the ALJ reasoned that Weidner-Clark's medical source statement was rendered two years after the date last insured, and it did not indicate that her findings were effective during the relevant period. (Tr. 22). Moreover, the ALJ found that Weidner-Clark's limitations were not consistent with Olson's treatment records during the relevant time period, in that no assistive devices were prescribed, Olson sometimes had an antalgic gait but not consistently, and none of her providers during the relevant time indicated that she had walking, sitting, or standing limitations. (Id.) Further, the ALJ reasoned that there were no treatment records from the relevant period with respect to Olson's alleged limitations from her hands or her eyesight. (Tr. 22-23). Finally,

the ALJ noted inconsistencies in Weidner-Clark's statement, in that she indicated Olson could not climb a few steps at a reasonable pace but later opined that Olson could climb ramps and stairs occasionally. (Tr. 23).

The ALJ further considered the opinions of the state agency consultants regarding physical and mental assessments of Olson. (Id.) These state agency experts opined in 2019 that there was insufficient evidence to establish any medically determinable impairments. (Tr. 89, 91, 101). The ALJ found these opinions unpersuasive, noting that the records supported a medically determinable impairment of anxiety, although the ALJ found this impairment to be nonsevere, and supported a finding that Olson had several severe physical impairments that limited her to light work with postural limitations. (Tr. 23).

The ALJ also considered Olson's statements regarding her limitations. (Tr. 29-32). At the administrative hearing, Olson testified that she first started experiencing pain in her ankles and feet in 2016, and she began treating with a podiatrist. (Tr. 55-56). After she got a second opinion, she treated her foot pain with an Arizona brace and physical therapy. (Tr. 56-57). At this time, she also received a cortisone injection in her knee to alleviate her knee pain, which ultimately did not provide her relief. (Tr. 58). She further testified that during the relevant period, she could only carry a gallon of milk, was only able to walk short distances, and could stand in one spot for about 5 to 10 minutes before experiencing pain in her ankles

and feet. (Tr. 63-64). Olson did state that she did not experience any problems using her hands during the relevant time, and that she mainly treated for her feet and ankles during that time. (Tr. 64). Regarding her activities of daily living, she testified that she was able to make dinner, shower with the use of a shower chair, and occasionally complete basic household chores. (Tr. 65-66).

The ALJ ultimately found that Olson's statements were not entirely consistent with the medical record. (Tr. 18-21). With respect to her activities of daily living, the ALJ noted that the record showed that she was generally independent in her activities of daily living. (Tr. 21). The ALJ noted that the treatment records indicated that during the relevant time, Olson reported being on her feet for long periods of time, moving her children into college, and performing household chores without difficulty other than joint pain. (Id.) Moreover, Olson's statements were not consistent with the medical evidence during the relevant period, which showed that she treated her foot and ankle pain with physical therapy and Arizona braces, and that she sometimes presented with a normal gait and had an antalgic gait at other times. (Tr. 19). The ALJ also noted that while x-rays showed degenerative changes in her feet, and a 2019 MRI showed degenerative changes in her back, there were largely normal physical examination findings during the relevant period including no tenderness of the legs and ankles, normal strength, no instability, normal muscle tone, and full range of motion of her feet. (Tr. 19-20).

14

The ALJ then found at Step 4 that Olson could perform her relevant past work as a family casework, front desk supervisor, and hotel clerk. (Tr. 23-34). However, the ALJ alternatively found at Step 5 that there were other light work jobs in the national economy that she could perform, such as information clerk, counter clerk, and furniture rental clerk. (Tr. 25). Having reached these conclusions, the ALJ determined that Olson was not entirely disabled and denied this claim. (Tr. 25-26).

This appeal followed. (Doc. 1). On appeal, Olson challenges the adequacy of the ALJ's decision, arguing that ALJ erred in his treatment of the medical opinion evidence and her subjective symptoms. As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision is supported by substantial evidence, and we will affirm the decision of the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial

> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir.

2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

## C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application in 2018 following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations

which defined medical opinions narrowly and created a hierarchy of medical source

opinions with treating sources at the apex of this hierarchy. However, in March of

2017, the Commissioner's regulations governing medical opinions changed in a

number of fundamental ways. The range of opinions that ALJs were enjoined to

consider were broadened substantially, and the approach to evaluating opinions was

changed from a hierarchical form of review to a more holistic analysis. As one court

as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg.
> 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel,</u> 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); <u>Connors v. Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

### D.   <u>Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms</u>

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also

illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare,* 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

> Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms

alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the

assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

## E.   The ALJ's Decision in This Case is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and

"does not mean a large or considerable amount of evidence," <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " <u>Biestek</u>, 139 S. Ct. at 1154. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's decision that Olson was not entirely disabled.

Here, Olson challenges the ALJ's decision, arguing that the ALJ erred in finding Dr. Epstein's and PA Weidner-Clark's opinions unpersuasive. She contends that these were the only two medical opinions in the record, and the ALJ did not adequately explain why he discounted them. However, we find that the ALJ sufficiently explained his reasoning for finding these opinions unpersuasive.

At the outset, we note that both of these opinions were rendered nearly two years after the plaintiff's date last insured. As for Dr. Epstein, Olson did not treat with this physician until after the date last insured when PA Weidner-Clark referred Olson to him for pain management in July of 2019, nearly a year after the date last insured. Courts in this circuit have recently upheld decisions by ALJs to discount medical source opinions that were rendered after the date last insured. <u>See e.g.</u>, <u>Atkins on behalf of Atkins v. Comm'r of Soc. Sec.</u>, 810 F. App'x 122, 129 (3d Cir. 2020); <u>Beety-Monticelli v. Comm'r of Soc. Sec.</u>, 343 F. App'x 743, 746 (3d Cir. 2009); <u>Dietrich v. Saul</u>, 501 F.Supp.3d 283, 291-92 (M.D. Pa. 2020) (opinion

rendered four years after the date last insured was too remote to apply to the relevant period); <u>Elswick v. Saul</u>, 2019 WL 6701725, at *8 (M.D. Pa. Aug. 30, 2019) (opinion given two years after the date last insured was properly discounted by the ALJ); <u>Wolford v. Berryhill</u>, 2017 WL 6405865, at *3 (M.D. Pa. Dec. 15, 2017) (opinion rendered over one year after the date last insured was not relevant to the period at issue). Simply put, " '[e]vidence of disability obtained after the expiration of insured status is generally of little probative value.' Indeed, post-date-last-insured medical evidence generally has little probative value unless it illuminates the claimant's health before the insurance cutoff date." <u>Dietrich</u>, 501 F. Supp. 3d at 291–92 quoting <u>Grisier v. Comm'r of Soc. Sec.</u>, 721 F. App'x 473, 477 (6th Cir. 2018). Therefore, the decision to afford little weight to these after-the-fact analyses was entirely consistent with settled case law. Moreover, while the records indicates that Olson treated with Weidner-Clark toward the end of the relevant period and thereafter, there is no indication that Weidner-Clark's medical source statement references the plaintiff's limitations during the relevant time period. Indeed, the medical source statement form states:

> The limitations above are assumed to be your opinion regarding current limitations only.
>
> However, if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations, on what date were the limitations you found above first present?

(Tr. 1172). Weidner-Clark left this question unanswered. Accordingly, the ALJ was permitted to conclude that this opinion referenced the plaintiff's limitations at the time the statement was given, rather than during the relevant period between August 1, 2016, and June 30, 2018.

In addition, the ALJ explained his reasoning for finding these opinions unpersuasive, stating that the limitations provided by these opinions were inconsistent with clinical examination findings and treatment during the relevant period. The ALJ recognized that the plaintiff had limitations due to her foot and ankle pain, as well as her symptoms of the later-diagnosed EDS, but ultimately concluded that the plaintiff could work within the light work parameters set forth in the RFC, consistent with the testimony of the Vocational Expert at the hearing. With respect to her back pain, the ALJ concluded that while there were some abnormal diagnostic findings, she did not treat for her back pain until after the relevant time period.

Olson contends that the ALJ further erred, not only in discounting her treating source opinions, but in discounting the 2019 consulting source opinions which stated that there was insufficient evidence of medically determinable impairments during

the relevant time. However, the ALJ explained that the record did, in fact, support medically determinable impairments. On this score, the ALJ found Olson's anxiety to be nonsevere, and found her EDS, bilateral pes planus with posterior tibial tendinitis, degenerative disc disease, left knee patellofemoral syndrome, asthma, and obesity to be severe impairments. Accordingly, the ALJ found these consulting opinions to be unpersuasive because the record supported some degree of limitations from these impairments. As we have explained, "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Here, the ALJ was faced with a record that indicated that the plaintiff was somewhat limited due to several severe impairments but did not support the more extreme limitations in the opinions of the treating doctors who treated Olson after her date last insured. The ALJ thoroughly recounted the medical record, including Olson's own statements regarding her impairments, and concluded that these opinions rendered almost two years after the relevant period did not support the more extreme limitations set forth in 2020 by Dr. Epstein and PA Weidner-Clark. Accordingly, we find that the ALJ adequately articulated the reasons for his decision, and we conclude that this decision is supported by substantial evidence.

The ALJ also adequately explained his reasoning for finding Olson's statements concerning the severity of her impairments not entirely credible. While

Olson testified that she was severely limited because of her pain, the physical therapy records showed that Olson was on her feet for days at a time, helping her daughter move into college, cleaning her house, and gardening. In addition, these treatment notes indicated that Olson's foot and ankle pain significantly improved by September of 2017. The treatment notes from Scranton Orthopedics also noted significant improvement and recommended that she continue with physical therapy rather than surgical intervention. While Olson alleged that she had chronic knee pain, she treated minimally for her knee pain when she received an injection in 2016. With respect to her asthma, the ALJ noted that Olson's asthma was well controlled, with no emergency room visits or pulmonary function tests. Accordingly, we find that the ALJ sufficiently explained his reasoning for discounting the later-rendered opinion evidence, as well as the consulting opinions and the plaintiff's subjective complaints. The ALJ reviewed the record as a whole, taking all of Olson's impairments during the relevant period into account, and ultimately determined that she was not entirely disabled. We conclude that substantial evidence supports this determination.

At bottom, it appears that the plaintiff is requesting that this court re-weigh the medical and opinion evidence. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657

(D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record.") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this opinion evidence.

In sum, on its merits the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly,

under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and we will affirm the Commissioner's final decision.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: August 19, 2022